UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

       Plaintiff,                 CASE NO: 18-20538

                                     HON. Judith E. Levy

v.

MARC ARMBRUSTER,

       Defendant.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

Marc Armbruster participated in the coordinated sexual exploitation of preteen and teenage girls with several other men. These men pretended to be teenagers, but the damage they did was far from pretend. Armbruster's group victimized more than 35 girls, with lifelong consequences for each one. Through negotiations with his attorney and the government's thoughtful evaluation of his case, Armbruster avoided the fate of his cohorts from the group, all of whom were found guilty of participating in a child exploitation enterprise. That crime subjected each

man to a *minimum* of 20 years in prison and a potential life sentence. But Armbruster pleaded guilty to conspiracy to receive child pornography, carrying a *maximum* of 20 years in prison. Armbruster then received a within-guidelines sentence of 20 years. Despite his good fortune in not being subjected to a potential life sentence, Armbruster now complains about his lawyer's assistance in virtually all aspects of the case.

Armbruster's claims fail, however, for a variety of reasons.   First, Armbruster's motion is untimely. Second, Armbruster entered a knowing and voluntary guilty plea, as evidenced by his thorough examination by the Court during the plea hearing. Third, Armbruster's complaints about sentencing amount to no more than a disagreement about how the Court exercised its discretion, not about any constitutional infirmity. Fourth, Armbruster never instructed his lawyer to file a notice of appeal, and it would have been frivolous to do so given his waiver of appellate rights in the plea agreement. Accordingly, Armbruster's motion to vacate his sentence should be denied without a hearing.

# I
# FACTUAL HISTORY

## A. THE FANS GROUP GENERALLY

In 2015, Marc Armbruster joined an already years-old conspiracy involving a group of men working together to entice preteen and teenage girls into producing child pornography via web camera on a chatroom-based website called Chateen. There were more than ten core members of the group who used the following scheme to obtain child pornography from the victims:

- group members pretended to be teenage boys online;

- group members recruited unwitting teenage and preteen girls from benign social media websites (an act referred to as "hunting");

- group members chatted openly, outside the presence of their victims and without the facade of pretending to be teenagers, in a "base" chatroom about how most effectively to convince the girls to undress and/or masturbate on camera;

- once the minor females were in a chatroom on Chatroom, the men collaborated in acts of manipulation—using time-tested techniques such as looping, dares, and other psychological deception—to entice the girls to perform various sexual acts on web camera;

- group members then captured or recorded the sexual activity and shared it with one another through the base chatroom and elsewhere (while simultaneously celebrating their "win"); and

- to protect itself, the group enlisted "watchers" to monitor the chatrooms to ensure no suspected law enforcement members or other unwanted persons accessed the room.

The group often titled its chatrooms with words or phrases built around the word "fans." It therefore became known as "the Fans Group." The Fans Group was wildly successful, resulting in the sexual exploitation of dozens of girls.

### B. JEREMY_FIVE IS A FANS GROUP MEMBER

John Garrison, one of the Fans Group members previously sentenced by the Court, set up automatic recordings of the streams of activity on Chateen. Garrison used a consistent naming convention for the videos he recorded. That naming convention identified the person who shared the recordings with the group. Sometimes, the name was that of one of the group's victims. Other times, however, the name was that of a fellow Fans Group member who shared a video. Through a review of these recordings, the FBI observed child pornography shared

by Fans Group member JEREMY_FIVE.

For example, JEREMY_FIVE streamed a loop in a chatroom associated with one of the identified minor victims from the Eastern District of Michigan, MV-20.   The chatroom was named kittenxo1. JEREMY_FIVE also streamed a loop in chatroom younowchat5, which was associated with both MV-20 and another minor victim from the Eastern District of Michigan, MV-22.   Based on Garrison's naming convention, it is evident that JEREMY_FIVE streamed frequently on Chateen, in chatrooms used by the Fans Group and in chatrooms frequented by victims from Michigan.   Garrison had copies of the videos shared by JEREMY_FIVE.

Moreover, a cooperating defendant identified JEREMY_FIVE as a Fans Group member.   According to this co-defendant, user JEREMY_FIVE was a talker on Chateen but only an ancillary member of the group.   This cooperator recalled that JEREMY_FIVE was a good talker and effectively communicated with minor females to get them to engage in sexual activity on web camera.

Chateen login data likewise supports the conclusion that JEREMY_FIVE was a member of the Fans Group.   Chateen was hosted

in Spain.   The Spanish National Police, based on requests by the FBI, obtained logs from the hosting service of Chateen.   These logs covered the period of April 1, 2015, to September 30, 2017.   The logs listed the IP address utilized by a user to perform an activity on the website. When a user logged into a room, the specific name of the room and the date and time that the IP was utilized to log into that room was specified. When a user streamed on camera in a chatroom the logs provided even more information.   Specifically, the logs provided that user's chosen user name, the type of web camera used, the user's IP address, the date and time the user started actively streaming on camera, and the total number of users in the chatroom at the time the user went on camera. For users that did not stream on camera in the chatroom, only the user's IP address—and not their username—appeared in the logs.

Chateen's logs showed that username JEREMY_FIVE consistently logged in from the same IP address between April 2, 2015, and June 26, 2016.   Most of these logins, moreover, were to chatrooms known to be associated with the Fans Group and with the so-called "base" chatroom that the group used to strategize about the victims.   This same IP address was used by JEREMY_FIVE to stream video in the chatroom

kittenxo1 (discussed above) at the same time as MV-20.   In other words, JEREMY_FIVE streamed his loop in a chatroom used to sexually exploit MV-20.   Similarly, the logs of Chateen showed that the same IP address was used to stream in the chatroom younowchat5 at the same time as MV-22 on April 3, 2015, using the username JEREMY_FIVE.   Thus, between the naming convention used by the cooperating Fans Group defendant, the login data provided by the Spanish National Police, and the child pornography videos recovered of Michigan victims MV-20 and MV-22, JEREMY_FIVE participated in the Fans Group generally and in the sexual exploitation of MV-20 and MV-22 in particular.

## C. JEREMY_FIVE IS MARC ARMBRUSTER

The FBI subpoenaed internet service providers for the IP addresses used by JEREMY_FIVE, eventually associating those IP addresses with the residences of Marc Armbruster. Data from Facebook showed that the same IP addresses used by JEREMY_FIVE to log into Chateen were used to log into the Facebook account used by Marc Armbruster. Other IP addresses used to log into Armbruster's Facebook account resolved to Armbruster's place of employment.

Importantly, two of the IP addresses used by Armbruster involved

conduct in 2017.   Specifically, the FBI obtained additional login data from Spanish authorities for Chateen users.   These newer logs included one of Armbruster's IP addresses accessing a website known as imgur.com. The Chateen investigation has revealed that Chateen users often shared images and videos of child pornography on imgur.com.   For the IP address used by Armbruster, two images of child pornography appeared. Both of these images were of the same minor female, who from her primary and secondary sexual features appears to be 13-16 years old. The first image showed her inserting a dildo into her vagina and was obviously a screenshot from Chateen. It was entitled "[minor victim's name] big dildo ;o".   The second was of a set of thumbnails for a video entitled "First bate (part 2).avi" which showed the minor female inserting the same dildo and displaying her genitals to the web camera. These images were clicked on by the user of the Armbruster IP address on March 13, 2017, and March 17, 2017, respectively.

Finally, to be sure Armbruster really was JEREMY_FIVE the FBI used a pen register/trap and trace (PR/TT) device on his internet service. The PR/TT showed visits to Chateen from Armbruster's residence multiple days per week between August 27, 2017, and October 13, 2017,

between November 30, 2017, and January 1, 2018, and again between January 18, 2018 and March 1, 2018.

The investigation into JEREMY_FIVE led to a search warrant execution at Armbruster's residence. Electronic evidence confirmed that Armbruster visited Chateen, had child sexually exploitive videos on his computer, and, in a statement to law enforcement, Armbruster admitted going to Chateen and to sometimes using the name Jeremy online.

## II
## PROCEDURAL HISTORY

### A. ARMBRUSTER PLEADS GUILTY

On August 27, 2018, Armbruster pleaded guilty to a single count of Conspiracy to Receive Child Pornography.   (R. 26: Plea Hearing, PgID 288).   At the plea hearing, Armbruster confirmed that he

- Was thinking clearly at the proceeding and had taken his medication (PgID 293-294);

- Understood the potential penalties included a possible sentence of 20 years (PgID 296);

- Employed two lawyers to help him with his case, discussed the case completely with the lawyers, and understood their advice (PgID 296-297);

- Was not threatened or forced to plead guilty (PgID 297);

- Was actually guilty of the crime (PgID 298).

The Court then went through the defendant's various constitutional rights, consequences of being required to be a sex offender, and the terms of the plea agreement (including potential penalties, waiver of right to appeal, and guidelines range). (R. 26: Plea Hearing, PgID 299-300, 303-309). Notably, the Court paused the proceedings to allow Armbruster and his attorney to discuss potential immigration consequences to his guilty plea and to answer a question about his plea agreement. (*Id.* at 300-303, 308-309). Finally, the Court ensured Armbruster understood that the sentence could be anywhere between five and twenty years in prison. (*Id.* at 312-313).

Armbruster then testified, under oath, that he was a talker for the group, was on Chateen for approximately 3 years, and that he was Jeremy_Five. (R. 26: Plea Hearing Tr. at PgID 27-30). However, Armbruster disagreed with some of the facts as outlined in the plea agreement, resulting in another break for him to clear up his misunderstanding with his attorney. (R. 26: Plea Hearing Tr. at PgID 31-35). After the break, Armbruster confirmed the information in the factual

basis of the plea agreement was true. (*Id.* at 323-324). Armbruster then admitted to working with other Fans Group members to entice two children – Minor Victims 20 and 22 – to masturbate on camera for the group to record. (*Id.* at 324-325). Armbruster acknowledged more than 35 minor victims were involved in the conspiracy. (*Id.* at 326). Finally, both the prosecutor and the Court—separately—asked Armbruster to read and confirm the accuracy of the factual basis set forth in the Plea Agreement. Armbruster confirmed (twice) that the statements were true. (*Id.* at 328-329).

Echoing the statements at the plea hearing, the plea agreement itself noted the maximum penalty was 20 years in prison, the guidelines range was over twenty years in prison (and thus resolved down to 20 years), and that the defendant waived his right to appeal the conviction and sentence. (R. 19: Plea Agreement). And as indicated above, the plea agreement also included a detailed factual basis that included Armbruster's admissions to exploiting dozens of victims. (*Id.*).

## B. SENTENCING HEARING

On March 14, 2019, the Court held a sentencing hearing. After having had the previous six and one-half months to consider his case,

Armbruster began by asking the court to maintain his guilty plea. (R. 27: Sentencing Hearing Tr. at PgID 336-337). Armbruster likewise reaffirmed that there were no issues with his lawyer. (*Id*.). The sentencing hearing included statements from the mother of MV-22, as well as the Court's acknowledgment of having heard the testimony from other victims of the Fans Group at previous proceedings. (*Id*. at 339-341).

Armbruster was well represented prior to and at sentencing. His lawyer filed a detailed sentencing memo highlighting his prior military service, difficult childhood, employment history, mental health issues, and cooperation. (R. 21: Defense Sent. Memo. at 93-109). Armbruster himself penned a letter to the Court highlighting the same things. (*Id*. at Exh. 1, PgID at 110). But Armbruster's letter revealed a man divorced from reality when it came to his crimes. Armbruster minimized his conduct, blamed the victims by claiming they "knew the difference between right and wrong," and claimed that he "never knew it was against the law." (*Id*.). While short on contrition, Armbruster's letter and statements to the Court provided great details of mitigation and how difficult his life had been in light of the charges in this case. (*Id*.).

At the sentencing hearing itself, Armbruster's attorney highlighted

his military service, cooperation, mental health history, tours of duty in Iraq and Afghanistan, and lesser involvement in the scheme than some of his cohorts. (R. 27: Sent. Hearing Tr. at 362-371). Armbruster's failure to recognize the significance of his crimes continued from his letter into his allocution at the hearing. Armbruster virtuously claimed to "completely dislodge" from the group "after I found out what was going on," and didn't "want to label myself as a talker." (*Id.* at 372-373). At one point—perhaps recognizing that the letter was not serving his interests—Armbruster (through counsel) even denied writing the letter to the Court. (*Id.* at 368-369). But just as he did in his letter, Armbruster highlighted the mitigating portions of his case: military service, childhood trauma, bipolar diagnosis, and his lesser role in the conspiracy. (*Id.* at 372-373).

After arguments from both attorneys, victim statements, the defendant's allocution, and the submission of written materials, the Court imposed a sentence of 20 years in custody. (R. 27: Sent. Hearing Tr. at 375-383). It did so thoughtfully. The Court spent considerable time discussing each of the section 3553(a) factors. Important to Armbruster's claims now, the Court acknowledged and considered Armbruster's

military service, childhood trauma, mental health history, and lesser role in the offense compared to some others. (*See, e.g., id.* at 375 (highlighting shorter involvement than other defendants); 377 ("I do care a great deal that you came into this world with a very harsh set of circumstances. You were living in a car at times with your mother because of abuse from your father and her escape from that. You suffered a horrible tragedy with your friend at age 17. You saw things in the war that you should not have seen and should not have happened. But it does not explain to me how you found it within yourself to hurt these children the way you did."); 379 (military service, family support)). But the seriousness of the offense, Armbruster's failure to fully accept responsibility, and the devastating consequences of the crimes on its victims all resulted in a sentence of 20 years in custody, which the Court noted was tied for the lowest for any member of the Fans Group. (*Id.* at 380-382). The Court emphasized that the sentence was "not arrived upon lightly." (*Id.* at 384).

At the end of the hearing, the Court reminded Armbruster that he had waived his right to appeal. Still, the Court told Armbruster, "if you or your lawyer believe you have a right to appeal the sentence, you must do so within 14 days of the entry of judgment." (R. 27: Sentencing Hearing

Tr. at PgID 387). Armbruster did not appeal. Instead, he filed the present (untimely) motion attacking his lawyer's performance.

## III
## LEGAL STANDARD FOR SECTION 2255 MOTIONS

A federal prisoner challenging his sentence under 28 U.S.C. § 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeded the maximum penalty allowed by law, or the conviction or sentence was "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quotation omitted). Importantly, claims not raised on appeal are not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998). However, claims of ineffective assistance of counsel are properly raised in a section 2255 motion. *See United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007).

Ineffective assistance of counsel claims are evaluated under the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must show that (1) "counsel's performance was deficient" under "prevailing professional norms"; and (2) "the deficient performance prejudiced the defense." *Id.* at 687–88. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997).

## IV
## ANALYSIS

Armbruster now claims his guilty plea was not entered knowingly and voluntarily. Armbruster also attacks his lawyers' performance at the sentencing hearing and for failure to file an appeal. Finally, Armbruster criticizes the Court for failing "to give an individualized sentence." (R. 29: Motion to Vacate at PgID 401). The transcripts and written submissions in this case belie Armbruster's claims. Armbruster has consistently failed to appreciate the significance of his crimes, his role in those crimes, and the damage he has caused to the more than three dozen victims in this case. Thus, it is unsurprising that he moves to vacate his sentence despite receiving the lowest sentence among his cohorts. But a

defendant's dissatisfaction with his sentence does not amount to constitutional error. As explained in more detail below, Armbruster's guilty plea, sentence, and lawyer's performance fell squarely within constitutional norms. His motion must be denied.

## A. TIMELINESS

This Court could deny Armbruster's motion as untimely. The judgment was entered on March 14, 2019. (R. 24: Judgment). Armbruster's right to appeal his sentence (although waived) required a notice of appeal to be filed by March 28, 2019. Under section 2255, a motion to vacate the sentence must be filed within one year of the entry of judgment, which would have required this motion to vacate be filed by March 28, 2020. *See* 28 U.S.C. § 2255. Armbruster did not file his motion until April 1, 2020. Thus, Armbruster's motion is untimely.

Armbruster asks the Court to apply equitable tolling to excuse his tardiness, citing the Covid-19 pandemic. (R. 29: Motion to Vacate at PgID 396-401). The Supreme Court has replaced the five-factor test Armbruster outlined with a more straightforward standard: equitable tolling applies when a defendant has diligently pursued his rights and an extraordinary circumstance prevented timely filing. *See Hall v. Warden,*

*Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) citing *Holland v. Florida,* 130 S. Ct. 2549, 2562 (2010) ("*Holland's* two-part test has replaced *Dunlap's* five-factor inquiry as the governing framework in this circuit for determining whether a habeas petitioner is entitled to equitable tolling"). But Armbruster does not identify how or why the Covid-19 pandemic hindered his ability to electronically file the motion on time. There can be no doubt that the pandemic has brought extraordinary change in virtually all aspects of life, including legal profession, prisons, and attorney-client relationships. But the extraordinary circumstances that could result in equitable tolling must "prevent timely filing." *Id.* Without identifying how the pandemic hindered his capacity to timely file the motion, Armbruster fails to justify the application of equitable tolling. The Court could deny Armbruster's motion for this reason alone.

## B. PLEA HEARING

Should the Court reach the merits of the motion, Armbruster fares no better. Armbruster suggests his lawyer's failure to hire an expert to "review, analyze, investigate, and provide expert opinions related to internet protocol address, software, technology, and equipment" was

ineffective. (R. 29: Motion to Vacate at PgID 406). Missing from this complaint, however, is what the outcome of such an analysis would reveal. The law requires more than just pointing out that his lawyer could have done something different. "Under *Strickland*, trial counsel has a duty to investigate his case", *see Stewart v. Wolfenbarger*, 468 F.3d 338, 354 (6th Cir. 2006), but the defendant must show "what evidence counsel should have pursued and how such evidence would have been material." *Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002) (citations omitted). Armbruster has not satisfied this burden as his pleading is silent as to what the expert would have opined and how that would have helped Armbruster. Nor could he. Armbruster's crimes involved nearly a year of consistent access to Chateen (a password-protected website dedicated entirely to child sexual exploitation) to collaborate with other grown men to sexually exploit young girls. The government had videos and images from Chateen; login data from Chateen's hosting platform; victims who could identify Jeremy_Five; co-defendants who worked with him; Armbruster's own admissions about going to Chateen; and one of the child pornographic images on his devices was clearly from Chateen. The FBI's years-long investigation successfully resulted in the conviction of

two dozen men who used Chateen. Armbruster's fate would have been the same. In the language of habeas petitions, Armbruster fails to show that his lawyer's performance was deficient under "prevailing professional norms." *Strickland*, 466 U.S. at 687–88.

For similar reasons, Armbruster cannot demonstrate prejudice under *Strickland*. *See id.* As explained above, Armbruster received a series of breaks compared to other Fans Group members. He was the only defendant allowed to plead guilty to something other than Child Exploitation Enterprise (*see* 18 U.S.C. § 2252A(g)), the only one allowed to remain on bond, and the only one allowed to even seek a sentence of less than 20 years in prison. It would have been arguably ineffective assistance for Armbruster's counsel not to urge him to accept the generous offer by the government. Armbruster cannot show prejudice.

Armbruster's guilty plea hearing transcript erases any lingering doubt about his guilt and that his plea was voluntary and knowing made. (R. 26: Plea Hearing Tr. at PgID 288). The Court established Armbruster's competency (PgID 293-294); the voluntariness of plea (PgID 297-298); his waiver of trial rights (PgID 299-309); the potential penalties (PgID 296); and the factual basis for his guilty (PgID 314-325).

Armbruster was an active participant in his guilty plea hearing, asking to clarify facts and circumstances regarding his plea on at least three occasions. (R. 26: Plea Hearing Tr. at PgID 303, 309, 322). Importantly, Armbruster confirmed that he had two lawyers, and that he had discussed the case completely with them and understood their advice. (*Id.*at PgID 296-297). Six and a half months later, at his sentencing hearing, Armbruster reasserted his satisfaction with his lawyers' representation. (R. 27: Sentencing Hearing Tr. at PgID 336-337). For Armbruster to now claim his lawyer provided ineffective assistance contradicts his testimony at both the plea and sentencing hearings. "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). In the end, the guilty plea hearing transcript confirms that Armbruster made a knowing and intelligent plea to a crime he certainly committed.

Finally, and perhaps most obviously, Armbruster's motion fails for what it does not say. In the context of a motion for ineffective assistance of counsel under section 2255, a defendant who pleads guilty must show that "but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Armbruster makes no such claim. This is fatal to his motion.

## C. SENTENCING HEARING

Armbruster next makes two allegations related to the sentencing hearing. First, Armbruster claims his lawyer was ineffective for failing to object to the government and the Court referencing his co-conspirators in evaluating the crimes committed by Armbruster. (R. 29: Motion to Vacate at PgID 407-408). Armbruster pleaded guilty to conspiracy to receive child pornography. At his plea hearing, Armbruster identified his co-conspirators as members of the Fans Group: Garrison, Fuller, Dougherty, Napier, and Nicart. (R. 26: Plea Hearing Tr. at PgID 324). His presentence report likewise identifies these men as Armbruster's co-conspirators. (PSR at p. 2). Armbruster's crimes cannot be divorced from his co-conspirator's activities, and the Court had an obligation to consider the full extent of the crime when assessing the relevant section 3553(a) factors. *See generally* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Second, Armbruster essentially argues that the Court got its decision wrong. He repeats the same mitigation information he championed throughout his sentencing memorandum, his letter to the Court, and at the sentencing hearing. Specifically, Armbruster suggests the Court failed to consider his military service, combat record, cooperation, childhood trauma, bipolar diagnosis, and his acceptance of responsibility. (R. 29: Motion to Vacate at PgID 413). Strangely, Armbruster then identifies that these same issues were raised in the defense sentencing memorandum (and therefore certainly available for the Court's evaluation). (*Id.* at 413-414). In any event, the Court repeatedly referenced these factors in its analysis, as did the government, and the defense. These issues were squarely before the Court. Armbruster's real complaint here is that his arguments did not carry the day. This is not cognizable in a section 2255 petition. *See Snider v. United States,* 908 F.3d 183 (6th Cir. 2018) ("Thus, § 2255 claims that do not assert a constitutional or jurisdictional error are generally cognizable only if they involved 'a fundamental defect which inherently results in a complete miscarriage of justice.'") (citing *Davis v. United States*, 417 U.S. 333, 346 (1974)).

### D. NOTICE OF APPEAL

In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the Supreme Court provided the framework to determine whether counsel renders ineffective assistance by failing to file a notice of appeal. An attorney "who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable," and thus fails the first prong of the *Strickland* two-part test. *Id.* at 477. But, when a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, "the question whether counsel has performed deficiently" by not filing a notice of appeal is best answered by asking "whether counsel in fact consulted with the defendant." *Id.* at 478. Counsel has a "constitutionally imposed duty to consult with a defendant about an appeal where there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 480. Where a defendant pleads guilty, a court must "consider such factors as whether the defendant . . . expressly reserved or waived some or all appeal rights." *Id.*

Here, Armbruster does not suggest that he instructed his lawyer to file a notice of appeal. Armbruster provides no information about whether he even discussed appeal with his lawyer. But Armbruster did discuss his appellate rights with the Court—twice. During the plea colloquy, both the prosecutor and the Court confirmed that Armbruster understood the terms of the plea agreement, including specifically the waiver of appeal read by the prosecutor. (R. 26: Plea Hearing Tr. at PgID 308-309). Second, at the conclusion of the sentencing hearing, the Court reminded Armbruster that he waived his right to appeal, but reminded him, "if you or your lawyer believe you have a right to appeal the sentence, you must do so within 14 days of the entry of judgment." (R. 27: Sentencing Hearing Tr. at PgID 387). Thus, Armbruster knew of his ability to file an appeal but simply chose not to do so.

Without Armbruster's direct instruction to file a notice of appeal, the analysis of potential ineffective assistance of counsel under *Flores-Ortega* next asks whether "there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."

*Flores-Ortega*, 528 U.S. at 480. Armbruster fails both prongs as he knowingly pleaded guilty, agreed to a plea agreement that waived his right to appeal his conviction and sentence, and received the lowest sentence among his co-conspirators. Nor had Armbruster indicated anything about appealing his conviction and sentence, either to his lawyer or to the Court, at any point during the proceedings. Against this record, there is simply "no reason to think" that Armbruster would want an appeal.

Under similar circumstances, the Sixth Circuit recently explained that defense counsel has "no duty to consult with [a defendant] about an appeal" where the defendant enters a "guilty plea," receives a "below guidelines sentence," and waives the right to appeal, because "a rational defendant would not . . . want[] to appeal" under those circumstances. *Goode v. United States*, No. 19-1218, at *2 (6th Cir. Oct. 18, 2019). This Court should follow *Goode* and deny Armbruster's motion regarding his lawyer's failure to file a notice of appeal.

# V
# CONCLUSION

Armbruster's motion filed under 28 U.S.C. § 2255 should be

denied without a hearing.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Kevin M. Mulcahy*
KEVIN M. MULCAHY
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI    48226
Phone:   (313) 226-9713
E-Mail: Kevin.Mulcahy@usdoj.gov

Date: June 18, 2020

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 18, 2020, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system, which will send notification of such filing to all users of record, including Armbruster's lawyer.

<u>*s/Kevin M. Mulcahy*</u>
Assistant United States Attorney
United States Attorney's Office
